UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>3423 FIFTH STREET, SE, APT 21<br>WASHINGTON, D.C. 20032<br>(PREMISES-1) | Mag. No. _____<br><br>UNDER SEAL |
| IN THE MATTER OF THE SEARCH OF:<br><br>137 IRVINGTON STREET, SW, APT 201<br>WASHINGTON, D.C. 20032<br>(PREMISES-2) | |
| IN THE MATTER OF THE SEARCH OF:<br><br>1364 FIRST STREET, SW<br>WASHINGTON, D.C. 20024<br>(PREMISES-3) | |
| IN THE MATTER OF THE SEARCH OF:<br><br>901 NEW JERSEY AVENUE, NW, APT 214<br>WASHINGTON, D.C. 20001<br>(PREMISES-4) | |

**AFFIDAVIT IN SUPPORT OF APPLICATIONS
UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE**

I, John M. Capano, being duly sworn, hereby depose, and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search 3423 FIFTH STREET, SOUTHEAST, APARTMENT #21, WASHINGTON, D.C. 20032 (hereinafter PREMISES-1), further described in Attachment A-1 (incorporated herein by reference), 137 IRVINGTON STREET,

SOUTHWEST, APARTMENT #201, WASHINGTON, D.C. 20032 (hereinafter PREMISES-2), further described in Attachment A-2 (incorporated herein by reference), 1364 FIRST STREET, SOUTHWEST, WASHINGTON, D.C. 20024, (hereinafter PREMISES-3), further described in Attachment A-3 (incorporated herein by reference), and 901 NEW JERSEY AVENUE, NORTHWEST, APARTMENT #214, WASHINGTON, D.C. 20001 (hereinafter PREMISES-4), further described in Attachment A-4 (incorporated herein by reference).

2. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) since May 2016. Prior to my appointment with ATF, I was a sworn New York City Police Officer from 2014 to 2016. In my capacity as a law enforcement officer, I have investigated individuals for the illegal possession and use of firearms, illegal possession and distribution of controlled substances, and for committing violent crimes. Many of these investigations involved the execution of search warrants and led to the arrest and conviction of individuals for violations of firearms and drug trafficking laws.

3. I have successfully completed training programs conducted by ATF and the Federal Law Enforcement Training Center. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Further, I have participated in numerous drug and firearm trafficking investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms.

4. Since this affidavit is being submitted for the limited purpose of obtaining search warrants, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in this affidavit in support of the warrants. I

make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other agents and law enforcement officers, reports and data provided by other officers, which I have read and reviewed, and, in part, upon information and belief. The sources of my information and belief include, but are not limited to: a) oral and written reports regarding this and other investigations that I have received, directly or indirectly, from agents of the ATF and other law enforcement officers; b) physical and technical surveillance conducted by your affiant and other agents and officers who have reported to me directly or indirectly; c) debriefings of confidential informants conducted by your affiant or reported to me directly or indirectly by other agents; and d) controlled drug purchases, examples of which are detailed *infra*.

5. From my personal participation in this investigation, as well as through interviews with, and analysis of reports submitted by, ATF agents and other law enforcement officers who are involved in this investigation, I am familiar with all aspects of this investigation.

### AFFIANT'S KNOWLEDGE, TRAINING, AND EXPERIENCE RELATING TO NARCOTICS OFFENSES

6. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.

7. Based on my knowledge, training, experience and participation in numerous other investigations involving phencyclidine (PCP), marijuana, cocaine base, heroin, and other controlled dangerous substances, I know that:

3

(a) Narcotics traffickers keep narcotics, narcotics related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds, and storage lockers. In addition, in an enterprise involved in the distribution and possession with intent to distribute cocaine base, PCP, heroin, or other substances, these locations may also contain apparently innocuous materials that are used for specific purposes in the drug trade. For example, small and large plastic baggies are the packaging material of choice for many narcotics traffickers; scales are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the narcotics being sold; microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are often used to "cook" powder cocaine into crack cocaine (cocaine base), or to mix and dilute heroin, and transport it discreetly thereafter.

(b) It is also common for narcotics traffickers to distribute from specific locations other than their own residences, to include stash houses, the residences of family members and associates, both witting and sometimes unwitting, and other locations where trusted associates of the trafficker are allowed access, in order to protect the cache of narcotics, as well as, the drug proceeds derived from the sale of these narcotics. Such locations provide security for the trafficker, and function as known locations where customers go to obtain narcotics.

(c) Drug traffickers often use and retain firearms and other weapons to protect themselves as well as to secure their cache of narcotics. Individuals who possess and store firearms in their residences, vehicles and/or stash locations, or in the residences of trusted

associates, often also store ammunition, shell casings, targets, holsters, gun cleaning kits, and ownership papers.

(d) Narcotics traffickers may also keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase. These records may be in written or electronic form. Narcotics traffickers also often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, numerous business cards, photographs, address and telephone number books and papers, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances, and contact information for associates and co-conspirators in the narcotics trade. This documentary evidence may include credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking. These items are generally retained for long periods of time in the drug traffickers' residences or the residences of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated. It also is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to iPods and external storage drives; and the media to store information, including CDs, DVDs, USB drives, or other data storage devices.

(e) Individuals involved in narcotics trafficking often conceal within their residences, the residences of family members, friends and associates, the places of operation of the drug distribution activity such as stash houses or safe houses, or in business locations with which the traffickers are associated, large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes. Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative or associate, in an effort to safeguard and conceal such proceeds of their drug trafficking.

## REQUESTED SEARCH WARRANTS

8. As described in greater detail below, ATF's investigation has revealed that multiple individuals are committing the offenses of possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offenses, in violation of 21 U.S.C. § 846 (collectively, the "TARGET OFFENSES"), and there is probable cause to believe that within the confines of PREMISES-1, PREMISES-2, PREMISES-3 and PREMISES-4, as set forth more fully in Attachments A-1 through A-4, respectively, there exists evidence and instrumentalities of the TARGET OFFENSES, as set forth more fully in Attachment B.

## PROBABLE CAUSE

9. In January of 2017 ATF began investigating the trafficking of narcotics in Southwest, Washington, D.C., specifically the area immediately west of the Washington

6

Nationals Baseball Stadium, which includes the James Creek Housing Authority property and its surroundings. ATF identified a group of individuals working together to distribute PCP, heroin, and crack cocaine. This group included Antonio Spencer ("SPENCER"), Damion Littman ("LITTMAN"), Davon Warren ("WARREN"), Maurice Spencer ("M. SPENCER), Kione Banks ("BANKS"), and Raymond Boston ("BOSTON").

10. On March 20, 2018, a District Court Grand Jury sitting in the District of Columbia returned an indictment against SPENCER, LITTMAN, WARREN, M. SPENCER, BANKS, and BOSTON, charging the defendants with conspiring to distribute and possess with the intent to distribute PCP, heroin, and crack cocaine, from January 2017 through at least July of 2017.

### INVESTIGATION AND CONFIDENTIAL INFORMANTS

11. ATF Confidential Informants (hereinafter collectively referred to as "CIs", or individually as "CI-1", "CI-2" or "CI-3") were used during this investigation. The CIs provided information regarding various drug dealers in the District of Columbia. The CIs were shown to be reliable to law enforcement. To my knowledge, the CIs have never knowingly made any untruthful statements to me or other agents involved in this investigation. Most of the information that the CIs provided was corroborated, to the extent possible, through surveillance and controlled purchases of narcotics. The CIs were compensated by law enforcement for the assistance that they provided. CI-1 has a criminal history that includes felony narcotics and forgery convictions. CI-2 has a criminal history that includes possession of controlled substances and petit larceny. CI-3 has a criminal history that includes a felony narcotics conviction.

12. During each controlled purchase in this investigation, the CIs who participated in the controlled purchases met with special agents prior to each controlled purchase. Special Agents searched the CIs and their vehicle, and verified that they were not carrying any narcotics or contraband. Members of law enforcement maintained physical surveillance of the CIs on the way to the controlled purchases and after the controlled purchases. To the extent possible, law enforcement maintained surveillance of the CIs during the controlled purchases. Following each controlled purchase, the CIs who participated in the controlled purchase met with special agents, turned over the illegal narcotics purchased, were searched and found to be free of narcotics or contraband.

13. On or about January 30, 2017, the three ATF CIs were instructed to attempt to purchase a quantity of narcotics in the area of 1399 Half Street, SW. Upon arrival, the CIs made contact with an individual who identified himself as "BIG LOW." Law enforcement later identified "BIG LOW" as SPENCER. SPENCER sold the CIs six individual packages of cocaine base in exchange for $100.00 in pre-recorded ATF funds. The CIs further used $40.00 in pre-recorded ATF funds to purchase three cigarettes dipped in PCP from SPENCER.

14. On or about February 6, 2017, CI-2 and CI-3 met with SPENCER near 1399 Half Street, SW. SPENCER led the CIs to an alleyway behind a row of residences, where he sold CI-2 one PCP dipped cigarette and a vial containing 5.7 grams of PCP in exchange for $150.00 of pre-recorded ATF funds. SPENCER then instructed the CIs to wait several minutes so he could get them cocaine base. SPENCER instructed the CIs to go to P Street, SW. At approximately 12:00 p.m., CI-2 walked with ANTONIO SPENCER to the rear of 50 P Street, SW where CI-2 purchased 2.8 grams of crack cocaine for $350.00 in pre-recorded ATF funds.

15. On or about February 16, 2017, CI-1 and CI-2 met with SPENCER in the hallway of an apartment complex located at 68 P Street, SW, and purchased a small quantity of cocaine base and a vial containing 23.75 grams of PCP from SPENCER in exchange for $120 and $300 in pre-recorded ATF funds, respectively.

16. On or about February 24, 2017, CI-1 and CI-3 arrived in the area of 1399 Half Street, SW, and made contact with LITTMAN. LITTMAN agreed to, and did sell, eleven bags of cocaine base and a bottle containing 21.24 grams of PCP to CI-1 and CI-3 in exchange for $100.00 and $280.00 of pre-recorded ATF funds, respectively.

17. LITTMAN has prior convictions for drug trafficking offenses and pending charges for drug related offenses. On October 22, 2016, LITTMAN was arrested in Southwest Washington, D.C. with approximately 10 grams of cocaine and is currently charged in Superior Court with possession of a controlled substance. LITTMAN's prior drug related convictions include possession of cocaine (2015), possession of cocaine (2012), attempted distribution of cocaine (2008), possession with the intent to distribute cocaine and marijuana (2007), and possession of marijuana (2006). Additionally, on May 5, 2017, MPD Officers observed LITTMAN and a group of individuals drinking alcohol in public while standing around an automobile at the Greenleaf Recreation Center in Southwest Washington, D.C. A search of the automobile revealed approximately 26 grams of crack cocaine and two firearms.[1]

---

[1] The automobile belongs to Mark Stephens, another individual in the group.

18. On or about March 21, 2017, CI-1 and CI-2 met SPENCER behind Carron Baptist Church at 1354 First Street, SW. The CIs purchased a bottle containing 55 grams of PCP from SPENCER in exchange for $1200 in pre-recorded ATF funds.

19. On or about March 30, 2017, CI-1 and CI-3 again purchased PCP from SPENCER. CI-1 met SPENCER behind Carron Baptist Church at 1354 First Street, SW and purchased six bottles of PCP (86.2 grams total) in exchange for $1200 in pre-recorded ATF funds.

20. On or about April 14, 2017, CI-2 called SPENCER and was directed to go to 1354 First Street, SW to meet with SPENCER's associate in order to purchase PCP and crack cocaine. SPENCER advised CI-2 that his associate was wearing a blue hooded sweatshirt. CI-2 arrived at the location and met with WARREN. WARREN sold CI-2 a cigarette box containing 5.5 grams of crack cocaine in exchange for $1200 in pre-recorded ATF funds and also gave CI-2 a utensils box containing four bottles of PCP (88.4 grams total).

21. On or about April 28, 2017, CI-1 and CI-2 purchased PCP from SPENCER through his brother, M. SPENCER. At approximately 10:30 a.m., CI-1 called SPENCER and CI-1 was directed to travel to 1354 First Street, SW. After arriving in the area, SPENCER directed the CIs to meet with his brother M. SPENCER. The CIs encountered M. SPENCER in front of PREMISES-3. M. SPENCER sold the CIs a bottle containing 89.1 grams of PCP in exchange for $1500.

22. On or about May 12, 2017, CI-1 and CI-3 again purchased narcotics from SPENCER through a third party, this time, BANKS. At about 11:13 a.m., the CIs called ANTONIO SPENCER and were told to go to 1354 First Street, SW. SPENCER later called the

CIs and directed one of them to walk through the alley to the rear of 1354 First Street, SW. The CIs then encountered BANKS and shortly thereafter BANKS sold the CIs a clear plastic bag with 2.6 grams of crack cocaine inside, along with a bottle containing 87.8 grams of PCP in exchange for $1500 in pre-recorded ATF funds.

23. BANKS was arrested on August 9, 2017 and was in possession of a 5/8 full bottle of PCP. Charges relating to this arrest are currently pending in Superior Court for the District of Columbia.

24. On or about June 21, 2017, CI-1 and CI-2 again purchased narcotics from SPENCER through a third party. SPENCER spoke over the phone with the CIs and told them to go to 1354 First Street, SW. SPENCER then directed the CI's to go down First Street, SW to P Street, SW. At about 1:23 p.m., BOSTON entered their vehicle and handed the CIs a bag containing three individual packages of suspected heroin (2.1 grams total) and a clear iced tea bottle containing 77.6 grams of PCP. BOSTON, SPENCER, and the CIs all spoke over a cell phone during this sale, and BOSTON ultimately sold the CIs the heroin and PCP at SPENCER's direction for $1500 of pre-recorded ATF funds.

25. Boston was also arrested on January 31, 2017 in possession of 1/2 ounce of PCP, three small bags of crack cocaine, and 11 bags of heroin. BOSTON was convicted of two counts of possession with intent to distribute controlled substances on October 25, 2017.

26. On or about February 15, 2018, CI-1 contacted SPENCER on the telephone to discuss purchasing narcotics. SPENCER indicated that he was still willing and able to sell narcotics to CI-1.

11

### IDENTIFYING PREMISES-1 AS SPENCER'S RESIDENCE

27. During the course of the investigation, law enforcement periodically received Cellular Telephone Tower Geolocation Data from SPENCER's cellular phone pursuant to a search warrant. Law enforcement observed location data indicating SPENCER's phone was kept in the area of PREMISES-1 on a regular basis, to include overnight. On March 5, 2018, law enforcement conducted surveillance of PREMISES-1 and observed SPENCER, along with a female and a child, exit PREMISES-1. Law enforcement further observed SPENCER appear to use a key to lock the door to PREMISES-1 as he exited. Additionally, law enforcement acquired a police report dated October 22, 2017 in which Stephanie WALTON, with a listed home address of PREMISES-1, contacted local law enforcement in connection with a domestic abuse incident that occurred within PREMISES-1. WALTON listed her boyfriend's name as "SPENCER CHARLES," date of birth August 17, 1992 and his home address as PREMISES-1. The report further states that WALTON and her boyfriend have been together for 10 years and have a child in common. Your affiant is aware that ANTONIO SPENCER's full name is "ANTONIO CHARLES SPENCER" and that his date of birth is August 17, 1993.[2] Your affiant viewed a second police report dated July 25, 2017, detailing a traffic collision in which WALTON was present with an "ANTONIO SPENCER," date of birth January 8, 2014. I believe that the ANTONIO SPENCER listed in the July 25, 2017 report is the common child of WALTON and the ANOTONIO SPENCER who sold various narcotics throughout this

---

[2] I believe that the two dates of birth are sufficiently similar in order to show that WALTON was referring to ANTONIO SPENCER during the October 22, 2017 law enforcement encounter, and that ANTONIO SPENCER is her boyfriend who lives in PREMISES-1.

12

investigation. The home address for both WALTON and the juvenile SPENCER is listed as PREMISES-1.

### IDENTIFYING PREMISES-2 AS LITTMAN'S RESIDENCE

28. During the course of the investigation, law enforcement became aware that LITTMAN was under the supervision of the Court Services and Offender Supervision Agency (CSOSA). CSOSA's address on file for LITTMAN is PREMISES-2. Law enforcement surveilled PREMISES-2 on February 21, 2018 and February 22, 2018. Law enforcement observed LITTMAN exiting the building's front door at approximately 8:00 a.m. on both dates. On the morning of February 26, 2018, law enforcement officers knocked on the door to PREMISES-2 and spoke with LITTMAN. LITTMAN informed the officers that he resided at PREMISES-2.

### IDENTIFYING PREMISES-3 AS MAURICE SPENCER'S RESIDENCE

29. Examination of toll records, law enforcement databases and the investigation itself indicated that ANTONIO SPENCER, MAURICE's brother, had previously resided at PREMISES-4. Law enforcement conducted surveillance of PREMISES-4 on February 15, 2018 and, at about 9:10 a.m., observed MAURICE SPENCER approach the front door of the residence from the inside. MAURICE SPENCER stood at the door for a short time before moving back into the residence. A March 6, 2018, query of a law enforcement database revealed that MAURICE SPENCER holds a valid District of Columbia identification card with a listed address of PREMISES-3. On March 7, 2018, law enforcement observed MAURICE SPENCER appear to use a key to unlock and enter the front door of PREMISES-3. Law enforcement

observed MAURICE SPENCER exit and appear to use a key to lock the front door of PREMISES-3 a short time later.

### IDENTIFYING PREMISES-4 AS BOSTON'S RESIDENCE

30. Examination of subpoenaed toll records revealed that the number 202-246-9543 is subscribed to BOSTON at PREMISES-4. Additionally, BOSTON is under CSOSA supervision and has a registered residence of PREMISES-4. BOSTON was contacted by CSOSA at PREMISES-4 on January 15, 2018 and February 8, 2018.

### CONCLUSION

31. I know that documents, records, photographs, ledgers, and digital storage devices are often stored at locations for long periods of time and this search warrants is requesting authority to search PREMISES-1, PREMISES-2, PREMISES-3 and PREMISES-4 for documents relating to narcotics trafficking as provided in Attachment-B

32. I submit that this affidavit supports probable cause for the warrants to search PREMISES-1, described in Attachment A-1, PREMISES-2, described in Attachment A-2, PREMISES-3, described in Attachment A-3, PREMISES-4, described in Attachment A-4, to seize the items described in Attachment B.

_____
John M. Capano
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn to before me this \_\_\_\_ day of March, 2018.

_____
Honorable Robin Meriweather
United States Magistrate Judge
For the District of Columbia

### ATTACHMENT A-1 (PREMISES-1)

*Property to be Searched*

The property to be searched is 3423 FIFTH STREET SOUTHEAST, APARTMENT #21, WASHINGTON, D.C. 20032 (PREMISES-1). PREMISES-1 is described as an apartment in a multi-story, red brick apartment building. "21" is displayed in gold numerals on the door to PREMISES-1. PREMISES-1 is located at the top of a flight of stairs, which leads to the lower level of the building. Below is a photograph of PREMISES-1:



## ATTACHMENT A-2 (PREMISES-2)

*Property to be Searched*

The property to be searched is 137 IRVINGTON STREET SOUTHWEST, APARTMENT #201, WASHINGTON, D.C. 20032 (PREMISES-2). PREMISES-2 is described as an apartment in a multi-story apartment building. PREMISES-2 is on the second floor and to the left as one approaches the second story landing. The numerals "201" are affixed to the door of PREMISES-2 in black text against a gold background. Below is a photograph of PREMISES-2:



## ATTACHMENT A-3 (PREMISES-3)

*Property to be Searched*

The property to be searched is 1364 FIRST STREET SOUTHWEST, WASHINGTON, D.C. 20024 (PREMISES-3). PREMISES-3 is described as a two-story townhouse type residence. "1364" is displayed above the front door in black numbers. The exterior of the building is red brick. The front outer door is brown with a clear top portion. There is a dark colored inner door behind the outer one. There is a window with black security bars to the right of the front door. Below is a photograph of PREMISES-3.



## ATTACHMENT A-4 (PREMISES-4)

*Property to be Searched*

The property to be searched is 901 NEW JERSEY AVENUE NORTHWEST, APARTMENT #214, WASHINGTON, D.C. 20001 (PREMISES-4). PREMISES-4 is described as an apartment in a multi-story apartment building. "214" is printed on a placard affixed to the wall to the left of the door to PREMISES-4. The front door to PREMISES-4 is brown with a grey knocker and peephole. Below is a photograph of PREMISES-4:



ATTACHMENT B

ITEMS TO BE SEIZED

1. Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records including cellular telephones, relating to the transportation, ordering, purchase and distribution of controlled substances, in particular any and all illegal controlled substances and any/all illegally dispensed drugs.

2. Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers.

3. Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashier's checks, receipts, pass books, bank checks, safety deposit box keys and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets, or any and all documents relating to residence.

4. United States currency, precious metals, jewelry and financial instruments, including but not limited to, stocks and bonds, documents and papers evidencing ownership, possession, storage and location of such assets and facilities to safely store and secure such items, such as safes (to include lock boxes, gun safes, and strong boxes).

5. Photographs, in particular, photographs of co-conspirators, of assets, and/or of controlled substances.

6. Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys.

7. Cellular telephones and pagers and records and receipts reflecting ownership and use.

8. Letters and other correspondence from or between members involved in narcotics trafficking.

9. Indicia of travel, including, but not limited to, passports, visas, airline tickets, boarding passes, receipts and other similar records.